Here we have two separate grants of summary judgment in claims contained in the same complaint, but which are largely factually and legally unrelated. Now, I'd like to address the first grant of summary judgment, which has to do with a claim pleaded both as a breach of contract and as a fraud. The case arises out of an Academy Award nominated picture in which the actor was awarded the Academy Award. So we're not talking about counsel. I think that we feel ourselves very disadvantaged because the district court judge didn't tell us why he did anything. Yes, I'm going to get to that in about 40 seconds. And I'll see if I can, with my crystal ball, help you with what he apparently decided. Well, maybe you don't even have to do that. If it's – if he didn't do it, he didn't do it. He didn't do it. But we know there are certain things he didn't decide. And from that, we can deduce what he probably did decide. So let me start by first setting up what this claim is. This motion picture, the plaintiff contracted with the defendant, CBS, to do the worldwide distribution of this picture, accepting essentially the United States and the United Kingdom. Shortly after they made the contract, the CBS division responsible for this contract dissolved and went out of business. It caused the plaintiff a lot of concern. But this complaint arises out of the television aspects of the distribution contract. And what CBS did with this excellent film was they packaged it with a group of fairly inferior films, save for a couple. There was My Fair Lady was in some of the packages. But by and large, they packaged this film with films that they owned, which is a very critical fact, including some television productions like 60 Minutes and films of such great stature as The Garbage Pail Kids. And they put it together in a package. Now, that is probably, in the broadest sense, okay if, in good faith, they take the proceeds of that package and allocate it in accordance with the quality and desirability of the film, which drives the package and produces the revenue. But in this case, what CBS did in most of the instances where they packaged Spider Woman with four or five additional pictures is they took the proceeds and divided them equally so that CBS favored its own pictures in which. Is that an established fact? There's evidence. It's a claim. Yes. There is evidence that they did that, yes. We finally did get. They valued them equally. Excuse me, Your Honor? That they valued the package equally. Not all. I'm not saying they did that on every package. But there were many, many packages where they did split the proceeds equally among the pictures. Sometimes they allocated unequally. But in the total, we think there's a misallocation that disfavored the plaintiff in an amount exceeding $1 million over the distribution of this film. Actually, if you take into the videocassettes, we're talking about $2 million. But there is clear evidence that in many instances they just allocated equally. All right. Now, to get back to Judge Fletcher's question, when the defendant made its motion for summary judgment, which was completely untimely, and I'll get to that for a moment. When they made the motion for summary judgment, they didn't challenge that the conduct I had described as packaging and misallocation constituted a breach of contract. What they said was that the statute of limitations as a matter of law had run on that contract for all but the four years preceding the filing of the complaint. Then with respect to the fraud issue, they said that was barred both by the statute of limitations and there was insufficient evidence of fraud. So what we know or we don't know what the judge decided, but we know that in granting summary judgment on the contract claim, he necessarily decided that the statute of limitations as a matter of law barred this claim because that was the only thing that was before him. On the fraud issue, he could have decided either that the claim was barred by the statute of limitations or that there was insufficient evidence or both. So now we have to deal with these questions. First, on the contract claim with respect to the statute of limitations, let me point out how untimely this claim was. Two weeks before the defendant deigned to move for summary judgment, Judge Reel had granted a request, putting over the discovery cutoff until December of 2000 and I guess it was 2001. In any event, there were 90 days at the time the motion for summary judgment was made, there were still 90 days of discovery left, during which we were seeking production of budget diaries showing the allocation method, recoupment documents showing that they had not recouped their investment on the films they were allocating to and therefore had an incentive to favor themselves. We had not yet gotten any documents on other issues and there were many depositions yet to be taken. So the motion was completely premature. It rested largely, if the Court please, it rested largely on the argument that in 1988, which was a considerable period before the complaint, original complaint was filed, a lawyer representing the plaintiff wrote a letter to CBS saying that they weren't doing their job and that they were going to terminate the arrangement. That letter was replied to by a CBS lawyer and those sets of that letter and the reply are in the record. We explained to the district court with a declaration of the law firm that wrote the letter that the concern in this era, the concern back at that point in time, had nothing to do with television distribution. And as the letter from CBS in reply showed, television distribution had barely begun at the time of the 1987 letter. And the concern at that point was that the CBS unit had closed down and there was concern about theatrical distribution in the theaters in these countries around the world. So that's what the concern was about. And then in 1988, the same law firm filed a complaint which it never served, which recited over and over again that it was the closing down of the CBS unit that was causing the concern, and there was no mention in that complaint about any packaging or misallocation of television revenues, nor was there any charge in that complaint about the misallocation of revenues resulting from videocassettes. The lawyer who drafted that complaint produced a declaration and he said that complaint was filed to protect the statute of limitations with respect to the same theatrical distribution issues that were covered by the letter of August of 1987. And so in the very best circumstances on an issue in which the defendant bears the burden of proof, I urge you to keep in mind that the statute of limitations is an affirmative defense and the defendant has the burden of proof. They came forward with a single letter and an unserved complaint and said that as a matter of law, that showed that the statute of limitations had run on our contract claims. We rebutted that by bringing in the lawyer that was involved in those letters and the made over television distribution. That lawsuit was dismissed and settled or what? It was never served and ultimately dismissed. Was there a settlement of some sort? No. The testimony of the lawyer was that after the complaint was filed, CBS, and they didn't know it was filed. They didn't even know it was filed through the filing of this lawsuit. When we entered the lawsuit, we found it there and we gave it to them. They still didn't know then that it had been filed or served. So we gave it to them and it was on that evidence that they said the statute of limitations had run. But the lawyer who did the complaint said, no, afterwards we got accountings from them and it showed they actually were distributing the picture in 36 countries around the world. And when we were satisfied that they were actually, despite the fact that they had dissolved, that they were actually fulfilling their obligations, he simply let the complaint lapse. So the complaint, he said, was just to protect against the statute of limitations and it had only to do with theatrical distribution. And the very best that you could say on this record is, yes, the letter and, yes, the complaint may raise a justiciable controversy about the statute of limitations, but in light of the rebuttal evidence from the lawyer who was involved in that, the fact is that you could – the trial judge could not conclude as a matter of law in a circumstance in which the defendant had the burden of proof that the plaintiff knew or should have known about the packaging and misallocation on the television side which weren't even involved in either the letter or the complaint. Now, it's quite clear this Court decided last year in the Alpolo Loco v. Hashim case that California follows the discovery rule even with respect to contract claims. And in the Alpolo Loco case and in the subsequent decision of the California Court of Appeals in the Grisman case, the Court looks to whether or not the defendant hinders – that's the word this Court used in Alpolo Loco – hinders the discovery. Well, here, the statements of revenue that CBS furnished the plaintiff said this. We've licensed your television – we've licensed your movie Spider Woman for television distribution in Germany, and we have X dollars of revenue. We've licensed it in Italy, and we have X dollars revenue. It did not disclose who they licensed it to. It did not disclose that it was licensed as a package. And most of all, it did not disclose how they went about allocating as between the various pictures in the package. None of that information was afforded to the plaintiff. And that more than satisfies the word hinder, as used in Alpolo Loco, so that here we invoke the discovery rule, and the fact is, as testified by Mr. Wiseman in his declaration and in his deposition, that he did not actually discover that they were packaging and allocating this picture in foreign television distribution until the filing of this lawsuit and the discovery that took place sometime toward the end of the lawsuit. And that's why we filed an amended complaint to include for the first time the misallocation of television revenues resulting from the packaging of this Academy Award picture with the CBS turkeys, like 60 Minutes, that had very little appeal and very little revenue-producing effect in foreign countries. So the bottom line here is that in a case where the defendant has the burden of proof, in a case where they hindered our discovery, where the discovery rule applies to the statute of limitations issue, there is no possibility, I respectfully say to you, that the court below could have found the lack of a justiciable controversy on whether this plaintiff knew or should have known. And on the issue of the fraud issue, whether there was evidence of fraud, even here in the Wolf case, in the Second Appellate District of the California courts, the burden seems to shift to the – again, to the defendants who explained that. But even if you don't accept the fact that the defendant had the burden of proof on the breach of contract and fraud claims on the merits, even if you don't accept that, the fact is that we produced evidence that showed they took this Academy Award picture, licensed it with a group of clearly inferior pictures, and there is no dispute about that. The wrong people said there was a conflict of interest. The wrong people said it was packaged with inferior pictures. And in many instances, not all, but many instances, they allocated equally. Equally. Garbage pail kids got the same amount of money as the spider woman. And that's just wrong, and that's fraudulent because their statements fail to disclose that fact, and that creates a justiciable controversy on the question of fraud. How much money are you talking about? About $2 million. $200 million? No, $2 million. $2 million. $2 or $3 million? Yes. Oh. Well, that's a lot of million. Yes. You have to remember, this is foreign distribution that took of a picture that was produced in 1985, so we're talking dollars reduced because of the levels that the inflation that's taken place since then makes that money look less important. Have there been settlement negotiations between the two parties? There was a post-dismissal mediation, which aborted. Now, everything is over. I'm going to suggest that you the case should be settled and that both parties go before We thought so. our mediation. We thought so, Your Honor. Okay. Any objection to that? Beg your pardon? Would you have any objection? Absolutely not. Okay. We had a mediator, and as I recall, he worked hard, and we thought we were getting some place, but at the end of the day, it aborted. This was a court mediator. I believe it was Judge Mr. Mums, recollection may be better, Judge Weinstein, a retired of the Superior Court in San Francisco, Daniel Weinstein. Oh. Is that right? Yeah. Okay. I think everybody was satisfied. You haven't used our court mediation service. We did talk to the court mediator. At the time, I didn't think we'd elect it after talking to the court mediator to go to Judge Weinstein. Oh. We did talk to the court mediator, yes. And she helped us consolidate. As part of appeal mediator? Yes. Yes, we did. But I think the parties elected to go to Judge Weinstein instead. And what was the outcome of that again? Nothing. We made some progress, but at the end of the day, it aborted. And that was after the judge granted the summary judgment, and I believe before the appeal was perfected, maybe while the appeal was going on. Well, there was no judicial push. That is correct. There was no judicial push. Does that make a difference? Sometimes yes and sometimes no. We find that judges who may be very good at judging may not be too good at mediating, and judges who may be not so good at judging are good at mediating. The skills are not necessarily the same. You know, the appetite might change if you knew that we were going to send this back to another judge to start all over. Yes. I think that's exactly correct. And hopefully that's what will occur, and hopefully we will then get into a mediation that will eliminate the need for that. Let me address the second claim, which is the film elements claim. Now, this is one where the judge had to have dismissed it on the merits. And it's just incredible to me that he could come to that conclusion. First off, the only legal argument they raised is that we weren't allowed to make a claim for an oral or implied contract because the contract, the paroled evidence rule prohibited that. Well, that's just not so. This contract, if you look at it, is not its exhibit ER-22. It's not integrated. Unlike other contracts in the record, it doesn't have a clause that says it contains all of the agreements of the parties. Mr. Weissman testified that he had an agreement with Mr. Sugar that at the conclusion of the use of this, at the conclusion of the contract, they would return the film elements to them. They're very expensive and they're very useful to him and not useful to CBS. Mr. Sugar said he didn't remember that agreement, but he didn't deny it. We've showed other contracts where CBS retained the film elements, but that wasn't in this contract. Now, the paroled evidence rule doesn't apply because the contract was silent on what would happen to the film elements. And because it was silent, the paroled evidence rule, which requires that you contradict the written terms in an integrated contract, just doesn't control. The contract wasn't integrated and there wasn't any term on film elements, so paroled evidence is not a problem. And then there are six documents produced by CBS, which each of which recited their obligation to return these. So if we're talking about an oral or implied contract, they are Exhibit ER-77, Exhibit 16. It says at that time when the contract ends, we will be required to return all elements to producers. ER-77, Exhibit 73, we must return all mastering elements to the client. These are all CBS documents. ER-77, Exhibit 24, I am sure Mr. Wiseman wants these elements returned to him. ER-77, Exhibit 25, we are required to return to the producer all the original elements. ER-79, Exhibit 5, all will be returned to him at the end of the contract. ER-79, Exhibit 10, the film elements belong to the successor in interest to HB Films at the end of the distribution term. It's not that summary judgment should have been granted to the defendant. If there is a summary judgment on the film element aspect of the case, it should have been granted for the plaintiff. If I could have a minute or two for rebuttal, I'd be grateful. Thank you. MR. MUMM. Good morning, Your Honors. May it please the Court, I'm Frederick Mumm. I represent CBS Broadcasting, Inc. I'd like to first address the request for a continuance because I believe floating through, at least in the appellate briefs, is the idea that the plaintiffs didn't have sufficient opportunity to obtain the discovery that they needed in order to properly oppose the motion. It's very important in considering the request for a continuance to take into consideration the fact that this appeal involves two separate motions with two separate records, two separate hearing dates. There was only a request for a continuance of the first motion. There wasn't any request with respect to the second motion. And the request that plaintiffs made for a continuance on the first motion only dealt with the fraud cause of action. They at that time said that they needed additional time to find evidence of wrongdoing and evidence of damages. They never requested any additional time with respect to the statute of limitations arguments or with respect to the film element. You didn't plead the statute of limitations in your answer. I believe we did, Your Honor. Did you? I believe so, Your Honor. That was an affirmative defense. We pled it at the time, not having knowledge of all the facts, but because the agreement had been entered into back in 1985 and they were claiming problems that had happened, supposedly, in the late 80s. For the most part, the television distribution works such that on the first exhibit, that's where you get all the money, and then on the third and fourth reruns, there's not that much money involved. And so the real, what you would consider the money claims would have been back in the early or the late 80s. So we pled the statute of limitations. And then Mr. Blucher is absolutely correct that it was only as a result of the plaintiffs delivering to us, indeed, after we filed our motion for summary judgment, they delivered to us this copy of the unserved complaint that we discovered, the extent of their knowledge of the facts. But with respect to the Rule 56 request, there are two factors that the plaintiffs would be required to show in order to be entitled to a continuance. The first would be that they would have to demonstrate what evidence they thought they could obtain, and then secondly, how that evidence could be used in order to defeat the motion. And they failed on both fronts. The only evidence that they stated that they needed is contained in Paragraph 41 of their Statement of Genuine Issues, that's in the excerpts of Record 58, and that request only related to budget documents and documents regarding CBS Fox Video. But they never said what they were going to do with the budget documents or how they would defeat the motion, the same thing with the CBS Fox Video documents. The record also showed that CBS had already produced all of the budget documents and CBS had already produced all the CBS Fox Video documents, and the plaintiffs did not attach even one of those documents to their opposition. So they didn't even use the documents that they had received, and there were no more documents to be produced in any event. So the Court correctly denied the request for a continuance. Incidentally, it just occurred to me to shift bases for a second. The plaintiffs state that the judge never indicated on what basis he was granting the motions. Well, the judge did sign the findings of fact and conclusions of law that were presented by the defendants. So to that extent, the judge certainly did find what CBS had been arguing on all of the grounds. He did not cross out anything on the findings of fact or the conclusions, and those appear. It's tab 11 in the supplemental excerpt of record and tab 16 where those findings have been signed by the judge. Moving to the statute of limitations arguments, CBS submitted what has to be considered devastating evidence with respect to knowledge of a claim back in 1987 or 1988 at the latest. There's the manned letter from Henry Holmes, the lawyer for the plaintiffs, where he's claiming to CBS that CBS is in breach of the agreement and has violated various duties. Now, is it true that that related to the films shown in theaters? There's nothing in the letter to indicate that. What the letter does say is that it's complaining about the closure of the CBS theatrical film division. At the time, CBS had a theatrical film division, and that division, which was headed by Larry Sugar, entered into the agreement in order to distribute the film. But that agreement was to distribute the film theatrically and by television and by video. So it was one agreement with one division that was going to distribute it on all of those fronts. Factually, were they doing much television and video at that time? At the time, in 87, it probably was just beginning. By the time they filed their complaint in 88, and the briefs point out where it shows it in the record that approximately 35 percent of the television revenues had already been received by that. So certainly there was substantial television distribution by 88. The other interesting thing is, with respect to the 1988 complaint as opposed to the 87 letter, they mentioned CBS Fox Video in that complaint, and they mentioned misallocation in that complaint. So CBS Fox Video doesn't have anything to do with theatrical. CBS Fox Video is solely video distribution, and that's contained in the complaint. They have a RICO cause of action where they state that CBS Fox and CBS Fox Video have been conspiring together in order to underreport revenues. In any event, in response to those three, well, I guess I didn't mention Mr. Wise submitted his deposition, testified that he had knowledge of a claim, but he didn't remember exactly what. And then they asserted the attorney-client privilege and refused to let him answer anything with respect to any communications with the lawyers or how he came about any knowledge or what information he actually had. So in response to the showing, plaintiffs come back with a declaration from Mr. Wiseman where now he's willing to testify as to items that he had refused to testify at his deposition, and moreover, they bring in the declaration of the lawyer, who's supposed or trying to testify as to the same thing. And so I think that the briefs adequately cover the fact that those declarations shouldn't have been admissible because it's inappropriate to assert a privilege in order to block the discovery of information on one end, and then later, when it would be to your advantage to use it, suddenly waive the privilege and provide the declaration. But even assuming, I think for the moment, certainly not conceding, because I believe those declarations should have been. They should not have been admitted. They were properly excluded. The test is an objective test. It's not a subjective test. So what the Court has to look at in ruling on a matter of law, whether the statute of limitations has commenced, is not what is in the actual mind, but what was available to the individuals and what they were aware of or should have had a suspicion of. The California Supreme Court has expressed the principle this way. A plaintiff need not be aware of the specific facts necessary to establish the claim. That is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts. She cannot wait for the facts to find her. And here, that 1988 complaint is conclusive evidence, certainly more than a suspicion. Here, they're alleging the exact same claims, the exact same fraud, the exact same breach of contract, the exact same situation with respect to CBS Fox that they're alleging in this action, and they alleged it back in 1988. Let me ask you a question that's silly, but sometimes the answers to silly questions are enlightening. Suppose, in this case, CBS bought an airplane. They bought the airplane because they thought they could promote the package better in foreign countries, flying VIPs around and entertaining them at the Ritz and so forth and so on. And CBS deducted the entire cost of that airplane to the plaintiff's films. And then when the contract was over, CBS kept the airplane. Nothing in the contract about airplanes. Could CBS and Paddleton keep the airplane? There's nothing in the contract regarding the airplane? Nothing in the contract about airplanes. Or entertaining VIPs or anything like that. Yes, I would think that the plaintiff may have some sort of a claim of improper deductions. There shouldn't have been deductions made for those items in a breach of contract, that claim. Yeah, but see, the plaintiff paid for the airplane. They paid for the airplane because when you deducted their royalties or whatever amount that you were supposed to pay them, you deducted that for the cost of the airplane. Well, the reason when the plaintiff. They paid for it and it should be theirs. The reason when the plaintiff didn't really pay for the airplane and why the plaintiff hasn't paid for the film elements here is that the contract makes it clear that the plaintiff is not entitled to deductions for costs. So that money was never available to the plaintiff. It had been a situation where there's X number of dollars that are going to the plaintiff and then you will say, well, let's take this away from you because we want to buy something else. But that's not how this contract was set up. The contract was set up that you have the revenue and the expenses and then there's a definition of the net receipts. Then you have the net receipts. And what the plaintiff is entitled to is net receipts. There's nothing about the plaintiff being entitled to any of the expenses. So the plaintiff hasn't paid for that. What about our mediation? Yes, there was a mediation in front of Judge Weinstein. And what you heard the plaintiff saying this is a $2 million case. CBS doesn't. Going back again would be futile. Unless something seriously changes plaintiff's perception of their case, I would say so. That, I mean, this claim, well, I won't characterize it other than to say that for the reasons set forth in the briefs, certainly CBS doesn't believe there's any merit to the claim. And plaintiffs believe there's great merit to the claim. And that's what creates trials as opposed to settlements. There doesn't seem to be. Well, was that packaging carried on with respect to this film and poor films? It's interesting because. And they all got an equal share. Well, yes and no. Not exactly. What the plaintiff's expert in his declaration even stated, that it's common practice on distribution of television that you would have a license agreement that included multiple titles. That's the way it's done for economic reasons because the television stations need a lot of programming and the distributor has a lot of programming that he's trying to license. So there's nothing unusual about that. It's common practice. And the plaintiff's expert testified it's commonly known that this happens. But I guess your position is maybe CBS cheated him, but the statute's wrong. Is that your bottom line? Well, the bottom line is CBS did not cheat him. But whether or not CBS cheated him, there's never been any evidence that CBS cheated him. My motion wasn't directed toward CBS cheating him. It was you don't even get to that. He can't he doesn't have any evidence of any fraud. What he's got at most is a breach of contract. And all I'm asking was when these packages were sold, were the proceeds divided equally? Generally, no. There are some of them, as I said early on in the cycle, you will have where the first showing on television, for instance, in a particular licensed area, there'll be a lot more money associated with that. So when you have the initial group of licenses with Kiss of the Spider Woman, it always got the most money. And we've had the license agreements have been produced. Most of the license agreements will show, for instance, say there are five titles and say that one of them is My Fair Lady and one of them is Kiss of the Spider Woman, and one of them is Table for Five, I think was one of the movies. My Fair Lady and Kiss of the Spider Woman would have gotten the most, and Table for Five would have gotten something less than that. And the license shows each one, and the licensee agrees to those prices for those films. There is, I believe, one or two license agreements that the plaintiffs have produced. We produce them, but they attach to the record, where it doesn't say in the license agreement, it's got a total amount for like five films. But that only happened in one or two, and there are 90 licenses, I think, altogether here. But with respect to later television showings, say the third or fourth in an area, then the television licensee is pretty much paying a standard price for the television show. So on those licenses, licenses that are going to be closer to the year 2000, you will see probably pretty equal amounts charged for each of the items. And depending on the television person, 60 minutes is derided, but that's a series where you have a lot of shows you can program, and that's very valuable to a lot of these television stations, as opposed to one movie that you're only going to show it once or twice. You can't just keep showing a movie over and over again to your audience. So, yes, there were multiple titles contained in the licenses, but that is no indication of any cheating the plaintiffs. I always grew up with the knowledge when I was young that the motion picture industry achieved prosperity because everything was done by handshake and everybody acted fairly, because if they didn't, they became a non-entity. What happened to that custom? As far as doing things by handshake? Yeah. We didn't sit down and have a bunch of lawyers draw up 95-page agreements to distribute a film. Well, to try to avoid a lawsuit like this. If you have it all in writing, theoretically, you're less likely to be sued. Your word is your word. If you didn't speak, you still had to act fairly. Well, and CBS did act fairly here. And I can see that I'm sort of running out of time. There were a couple of points that I don't – I would like to emphasize. One of them is – because we're raising the reply brief, I haven't had a chance. Let me ask this. This is summary judgment, and what we're looking at, are there any material disputed facts? And, you know, we kind of are mushing around that issue. Right. Well, and the fact is, are there any disputed facts where there's evidence that would create a dispute? And here there isn't. First of all, you've got the statute of limitations. That 1988 complaint has got the same allegations. Under the California Supreme Court – and this is California law we're applying here – under the California Supreme Court, a suspicion of wrongdoing is sufficient to start the statute of limitations, so long as there is a suspicion. Filing a complaint under Rule 11, you have to have more than a suspicion in order to legitimately file a complaint. It was filed in federal court. Well, I guess the issue that they're claiming is that this related only to the theatrical film production. And what I would suggest is that there are two problems with that theory. One, even if it did – That creates a factual issue, doesn't it? Well, no, it doesn't, because – Why not? Because this whole idea of theatrical film, first of all, it's only in their head. It's not a subjective test. It's an objective test. There's nothing in their complaint that says anything about it being theatrical film. Their complaint says theatrical television video. It's all listed what the – excuse me – what the agreement related to. So as a matter of fact, their subjective declaration is irrelevant. That's not what the California Supreme Court looks at. But then secondly, if you think about it, this is one agreement for distribution of the film in foreign countries. If they're saying, well, we thought that CBS was really doing us in when they were distributing it in France in theaters, how is that different from doing them in when they're distributing it in France on television? Well, I guess only factually if, in fact, the television distribution hadn't started. And is there any doubt about when that started? There's absolutely no doubt as of that 1988 complaint. And it's in the record. We attached the profit participation statement that had gone to the plaintiffs, I think it was two months prior to the filing of that complaint, that listed all the television revenue. That revenue was already – and only in 1988, the first three years of the agreement, that's 35 percent, I believe, of the total television revenue they got over the 15-year term. Most of it was right up front there. They'd already received that before they even filed their complaint. And how much money was that? How much money was it? It was in the hundreds of thousands. I think it was around $500,000, $400,000. I could dig it up, if Your Honor would like. I've got the record here with me. Oh, well, we'll settle for $500,000. It's not going to settle for $500,000. No, I mean I'll settle. Oh, you'll settle. Okay. I understand. I'm not pushing you to do anything. But in any event, that was – You probably ought to go to the court mediator. Well, we certainly made one stab at that. Well, I think there's – I think our mediators are highly effective. Before I conclude, Your Honor – We've got to have a building. We've got guards around it, you know. I just mentioned in response to the reply brief there were a couple of points. One of them is the economic loss rule the plaintiff refers to as only applying to the sale of goods. The California Supreme Court has held that that applies to contracts for services as well. And that would be AAS versus Superior Court. The reason I didn't cite it is because I didn't have a chance. It was only raised in the reply brief. But the cite on that is 24-Cal-4. You can leave it. Leave it? We have a sticker you can – Okay. Thank you. I appreciate that. The – I guess I'm out of time. Didn't quite reach the rest of it. Well, what else do you want to say? Say it quickly. Okay. What I wanted to – okay. I wanted to point out that with respect to the oral agreement on the contract, the – this is an area where it's very important to pay attention to the fact that there were two separate motions with two separate records. Because on the second motion, which was the one relating to the return of the film elements, that was – the declaration that the plaintiff submitted regarding the oral agreement only talks about French film elements. And that was consistent with the deposition testimony. He doesn't have – he doesn't allege in his declaration that Mr. Sugar agreed to return all the film elements. So even if the parole evidence rules – I think it is applicable and should block the evidence. But even if it didn't, the fact is the only evidence that was submitted was that there was an agreement with respect to French film elements. Who paid for those items? Well, CBS paid for it because what – But then they deducted it. Yes, they did. But the point is they had the risk. Had there been no revenues at all, CBS would have just been out that money When that agreement was made, that risk was allocated to CBS. Has that ever happened? Where they don't receive? I believe that it happens a lot of times where you never make a break-even point on distribution. Well, the Spider Lady is different. The Kiss of the Spider Woman? Yes. At the time it was an art house film. They didn't know exactly what it was going to be. Yeah, well. And CBS made efforts and they made millions of dollars off of it. Yeah, well, anything will sell, I suppose. Yeah. All right. Thank you, Your Honor. That's it. Bleacher. Just a few tick points, Your Honor, because I know I'm basically out of time. On this question Mr. Mumm raises that the California Supreme Court says that any suspicion triggers the running of the statute. Not so. In the April case, April Enterprises, which is the seminal case in which the California Court held that the discovery rule applies to a breach of contract as well as a tort. The April court says plaintiffs should not be compelled to file hair-trigger lawsuits over every possible secretive breach that the defendant may have committed merely to smoke out whether the breach has occurred and the statute of limitations thus commenced to run. So April, in a case such as this, and April was cited with and followed by this court in Apollo Local, in a case where the defendant hinders the discovery, the rule Mr. Mumm relied on is not followed and a different rule is that the defendant is penalized for hindering or concealing the discovery of facts. Now, his argument on the 1987 letter and 1988 complaint is simply inaccurate. In the 1987 letter, Mr. Holmes, that's ER 53, Exhibit A, says, Our client has just caused to complain that the agreement resulted from fraud in the failure of performance as a result of the sudden dissolution of CBS Productions, your feature film division. Then Mr. Blackman submits a declaration in which he said that their concern at this point in time, in October of 1987, we received a confidential work product report from an expert on the subject of theatrical distribution of the picture, Kiss It a Spider Woman. I do not recall any complaint expressed pertaining to distribution of the picture on television at that time. And then Mr. Wiseman reinforces that, and Mr. Mumm's argument that Mr. Wiseman suspected a violation of block booking is totally out of context, because if you read the deposition, it's clear that he was talking about a different company called Island and he was talking about the distribution in the United States. Kennedy. But I disputed fact issues there. Exactly. And then if you look at the complaint, there's nothing in the charging paragraph that says you're block booking our pictures overseas or you're misallocating the revenues from television or you're misallocating the videocassettes. Again, in paragraph. We got it. Pardon? I said we got it. I mean, we understand. That's it. Thank you. Okay. Thank you. All right. All right. We're going to take another short break, and then we'll be back on a little bit later.
judges: B. Fletcher, Pregerson, Ferguson